Syllabus.

PETER HAMILTON ET AL. *v.* JOHN F. HALPIN ET AL.

68   99
79   250

1. TRUST-DEED.   *Sale by trustee.   Possession not necessary.*
   Although a trust-deed recites that upon default in the payment of the debt
   secured, it shall be the duty of the trustee to take into his possession all
   the property and sell the same, the taking possession is not a condition
   precedent to the power of sale.   *Tyler* v. *Herring*, 67 Miss. 169 ; *Vaughn*
   v. *Powell*, 65 Ib. 401.

2. CHANCERY PLEADING.   *Fraud.   Answer.   Sufficiency of denial.*
   Where a bill seeks, among other things, to cancel a trust-deed, because of
   fraudulent conduct of the beneficiaries in procuring its execution, and
   especially to have declared invalid a sale thereunder, because of fraud
   on the part of the trustee and beneficiary in concealing the time of sale
   and in making it without public outcry, and in his answer the pur-
   chaser, claiming to have bought in good faith, expressly denies "all
   knowledge, belief or suspicion of fraud practised upon complainants,"
   and further says that, " if fraud there was in the sale, the respondent is
   wholly without knowledge of the same," this is sufficient to prevent the
   charges of fraud from being taken as confessed.

3. CHANCERY COURT.   *Privilege tax ; failure to pay.   Cancellation.   Complainant
   must do equity.*
   Though under the statute no suit is maintainable to collect debts due a
   merchant who fails to pay his privilege tax, equity will not relieve a
   debtor who, as complainant, seeks cancellation of a trust-deed on this
   ground, unless he offers to pay all that is justly due.   Who seeks equity
   must do equity.   *Deans* v. *Robertson*, 64 Miss. 195, cited.

4. PARTNERSHIP.   *Homestead in partnership lands.   Case in judgment.*
   Nine men, desiring to embark in a farming venture, purchased a planta-
   tion, executing their joint and several notes therefor, taking title to
   themselves jointly, each cultivating a separate portion of the land, all
   under an agreement that the net earnings of each should be applied to
   paying for the plantation, each finally to own an interest in the planta-
   tion proportionate to the amount paid by him.   They were called by
   themselves and others the " Bear Camp Colony," and had a chosen rep-
   resentative, styled president.   *Held*, that they were not tenants in com-
   mon, but partners, and that they could not, as against a debt contracted
   for their joint benefit, claim homestead exemptions, nor defeat a trust-
   deed given to secure such debt, because not signed by their wives.

FROM the chancery court of Issaquena county.
HON. W. R. TRIGG, Chancellor.

In July, 1878, the appellants, Peter Hamilton and eight others, united in the purchase of a large tract of land, then unimproved, and for the purchase-money executed five joint and several promissory notes, due respectively January 1, 1880, and annually thereafter. By the deed the land was conveyed to them jointly. Immediately thereafter they went into possession of the land, and each began the clearing and cultivation of a separate portion. In the matter of the purchase and improvement the parties acted under an agreement, the purpose of which was to secure the services and earnings of each in paying for the land. This agreement, while well understood by the parties, was not reduced to writing until June, 1882, when it was written and signed by all the parties. After setting out the purchase of the land and the terms of payment, and the execution of notes therefor, the agreement recites, "that when said notes shall all have been paid and satisfied according to their meaning and tenor, then the interests, shares and claims in and to said land of said respective parties shall stand and be in proportion to the several amounts paid respectively by said parties in settling said notes; that is to say, that each man's share in said land shall bear the same proportion in quantity and value to the whole land as it then exists as the sum or sums of money paid by him in settlement of said note bears to the whole sum paid by all of said parties in payment of said notes, and if any of said parties should pay nothing on said notes or should have paid nothing heretofore, he shall have no interest or share in said lands. This agreement being to reduce in writing the verbal understanding and agreement of said parties when said land was conveyed to them as aforesaid." The parties styled themselves the " Bear Camp Colony," and selected one of their number, Peter Hamilton, as their president or representative.

During the year 1879 the appellants traded with Halpin, Bonham & Co., merchants in Vicksburg. In May, 1880, the account against the colony, then unpaid, amounted to about $1200, and for this sum and the further sum of about $400, advanced by Halpin, Bonham & Co., the members of the colony executed their joint promissory note, payable to said firm, and secured it by a trust-

deed of that date upon the Bear Camp Plantation and the crops to be grown thereon during that year. The trust-deed was signed "Bear Camp Colony, by Peter Hamilton," and in the officer's acknowledgment of the deed he is termed the president of the colony.

Halpin, Bonham & Co. made further advances during the year 1880, and paid off one of the purchase-notes of the land, so that at the close of the year there appeared to be due on the account of the colony about $2100, and in March, 1881, the appellants executed a second trust-deed to Barnett, as trustee for Halpin, Bonham & Co., to secure the said sum of $2100 alleged to be already due, and also a further sum not to exceed $3000, agreed by said firm to be advanced to pay off the second purchase-money note for the land and for supplies to be furnished during the year 1882. The trust-deed embraced the plantation aforesaid and also all the mules in the possession of the appellants on said plantation, and all the crops to be grown thereon during the year 1881. The trust-deed was in the usual form, and provided that "upon default of payment of said note at maturity, it shall be the duty of the party of the third part herein, at the request of the holder of said note, to take into his possession all the property described herein, and, after advertising the time, place and terms of sale in some daily paper published in the city of Vicksburg for at least ten days before the day of sale, to proceed to sell said personal property and real estate at the east door of the court-house, in Vicksburg, to the highest and best bidder for cash at public outcry, or a sufficiency thereof to pay said note, and the cost of executing this trust. This trust-deed was signed and acknowledged by each of the appellants, and placed upon record.

In the spring of 1882 the indebtedness of the colony to the firm of Halpin, Bonham & Co. having been largely increased during the previous year on account of advances and the payment of another of the purchase-money notes, the appellants executed still another trust-deed to John F. Halpin & Co. (successors to Halpin, Bonham & Co.). This trust-deed recited an indebtedness to said firm of $8500, evidenced by a promissory note of date April 26,

1882, and to secure this as well as any other sums of money that might become due and owing by the appellants to said firm, they conveyed the said plantation and all of the mules and farming implements on the same. This trust-deed contained the usual stipulations for a sale by a trustee, but it does not appear from the record that the trustee in selling the land as hereinafter recited acted under this trust-deed.

On July 17, 1882, Barnett, the trustee in the above-mentioned deed of March 11, 1881, conveyed the entire plantation to John F. Halpin & Co., the conveyance being in the usual form of a trustee's deed, and duly acknowledged and recorded. This deed recites that the trustee having been requested by the holder of the note secured in the trust-deed, proceeded to advertise and sell in accordance with the terms of the said deed of trust, and that John F. Halpin & Co. having been the highest bidder for cash at said sale, the land was sold to them for the sum of $3500.

Subsequently, in November, 1883, John F. Halpin, George M. Klein and A. K. Bonham, who are shown to have been partners in the firm of John F. Halpin & Co., conveyed the said plantation to Mrs. Regina Meirs, reciting in the deed a cash consideration of $8500, and thereafter, and until the filing of this bill, Mrs. Meirs has continued in possession of the land, claiming it as her own, and it appears from the evidence that the appellants interposed no objection to the assertion of title by Halpin & Co. and by Mrs. Meirs until the filing of their bill in this cause, but on the contrary, most of the appellants remained upon the plantation after the purchase by the latter, and paid rent to her annually thereafter.

On the 30th of August, 1887, the appellants, members of the aforesaid colony, filed the bill in this cause against the members of the firm of Halpin, Bonham & Co., Barnett, the trustee in the above-mentioned trust-deed of March 11, 1881, Regina Meirs and Francis Smith, Caldwell & Co., to whom Mrs. Meirs had executed a trust-deed for borrowed money. The bill recites the purchase by appellants of the land, and gives a history of the dealings of the appellants and the "Bear Camp Colony" with the firms of Halpin, Bonham & Co. and John F. Halpin & Co., and sets out

the execution of the trust-deed of March 11, 1881, and the deed by the trustee therein to Halpin & Co., and the deed of the latter to Mrs. Meirs. Complainants allege that they did not voluntarily execute the aforesaid trust-deed of March 11, 1881, as it is written. They aver that they were approached by the defendants Halpin, Bonham & Co., who won their confidence and prevailed upon them to execute a trust-deed upon their personal property to pay off the indebtedness mentioned in the trust-deed; that it was not contemplated by them that the plantation should be included in the deed, they having expressly refused to embrace any of their real· estate in it; that the firm of Halpin, Bonham & Co. designedly and with a purpose to defraud them included the land in the trust-deed as prepared by them, artfully suppressing the fact at the time it was signed, and that its insertion in the trust-deed was a fraud upon complainants. Complainants further allege that the trustee, joining in the fraudulent scheme, executed a deed in his capacity as trustee to John F. Halpin & Co., reciting a compliance with the terms of the trust-deed, whereas, in fact, the land was not sold at public outcry at the time and place appointed. They allege that on the day before the pretended sale, two of the appellants, learning ·incidentally that the lands were about to be sold, went immediately to Vicksburg in order to be present, and, if possible, prevent the sale; that they remained during the whole day at the court-house, and that there was no sale so far as they could see or hear, but that afterwards they were informed that their lands had been sold and deeded to Halpin & Co. They allege that the lands were worth more than twice the amount of the indebtedness to Halpin & Co., and that the personal property included in the trust-deed was sufficient to have paid the indebtedness, and they claim that it was the duty of the trustee to have first sold the personal property, even if the land was legally embraced in the trust-deed. They further allege that the account of Halpin & Co. was largely made up of usurious interest and unlawful commissions, and that the goods furnished to them were sold at exorbitant and extortionate prices.

Complainants further allege that all the defendants, except Francis

Smith, Caldwell & Co., colluded and conspired in this scheme to defraud them out of their plantation; that Mrs. Meirs was a relative of John F. Halpin, and at the time of her purchase was fully informed of the fraudulent purpose on the part of Halpin & Co., and was a participant in his fraud.

The prayer of the bill is for an account between complainants and defendants, Halpin & Co., and for a decree giving complainants a reasonable time to pay up the balance found due, and in default thereof that the personal property embraced in the trust-deed be sold; that the trust-deed, so far as it affects the lands, be cancelled.

Complainants allege that they are, each of them, the head of a family, occupying separate portions of the "Bear Camp Plantation" as a homestead. The wives of the complainants are joined as complainants in the bill, in order that they may assert their homestead rights. The complainants also pray that the trust-deed of Regina Meirs to Francis Smith, Caldwell & Co. be vacated because of the facts above stated, and because of their alleged knowledge of all the facts stated in the bill.

None of the defendants interposed a defense to the bill except Mrs. Regina Meirs. In her answer she denies that she is a relative of Halpin, and denies all knowledge of the dealings between appellants and Halpin, Bonham & Co. or their successors, John F. Halpin & Co. She alleges that she had never heard of appellants or their lands until she made the purchase; that she had no other information in reference to the matters alleged in the bill than that derived from the deeds which were upon record. She alleges that after her purchase the appellants and their wives continued to live upon the land as her tenants, and never in any manner intimated that they had any claim upon the land. Responsive to the charges of fraud her answer says: "She expressly and unreservedly denies every and all charges of fraud or participation in fraud practised upon appellants by any one mentioned in said bill," and after denying all knowledge, belief or suspicion of fraud practised upon appellants by any one in connection with the land, the answer says: "That as to the several charges in the said bill relative to fraud,

covin and misrepresentations practised upon appellants in obtaining their signatures to said deed of trust, in concealing from them the time of said sale, in misapplying proceeds of cotton, in extortionate prices charged and usurious interest and unlawful commissions, and in the sale of said land, if any such frauds there were, she is wholly without knowledge, information or belief, etc."

A vast amount of proof was taken and the record in the case is exceedingly voluminous, but the statement of facts here given is deemed sufficient when taken in connection with the opinion of the court. On final hearing the court dismissed the bill, and from this decree complainants appealed.

*E. J. McGarr* and *Nugent & McWillie*, for appellants.

The trust-deed required the trustee to take possession of the property before making sale, and this was not done to the knowledge of all the parties concerned. Possession or demand for possession was a condition precedent to the power of sale. 7 Gray, 243; 4 Allen, 516; 45 Ill. 493; 63 Mo. 52.

The power of sale in a trustee must be strictly construed. *Bowman* v. *Roberts*, 58 Miss. 126; 2 Brock, 422.

Upon the slightest proof of fraud or interference, or of departure from the power, trustee's sales will be set aside. 3 Gillman, 32. So also if the amount of the debt is uncertain and disputed. 5 Leigh, 370; 9 Yerg. 301; 10 Leigh, 547; 1 Gill, 130.

The trustee advertised, sold and conveyed the lands only. Fairly considered, the trust-deed required a sale of the personalty first. The requirement that possession was to be taken of all the property shows that this was the evident expectation of the parties. Besides, the personalty should have been sold first in order to preserve the homestead rights of the appellants. Having demanded and received a trust-deed upon a large amount of personal property, Halpin & Co. could not bring in the express lien of February, 1878, to hide or cure the fatal informalities in the contract of March 11, 1881. *Davis* v. *Williams*, 40 Ala. 433; *Tyler* v. *Jewett*, 82 Ib. 93.

The answer does not deny that there was any public sale of the land at the east door of the court-house in Vicksburg for cash as

required in the trust-deed. The answer of Mrs. Meirs merely denies all *knowledge* of the fraud alleged against Halpin & Co., and such denial is clearly insufficient. She nowhere states that the sale was at the court-house door, nor does she deny the allegation that the trustee never took possession of the property.

Mrs. Meirs was chargeable with notice of all the contracts, and of every matter connected with or affecting the estate, which appears either by description, or recital, or reference on the face of the deeds which form links in the chain of her title. 2 Pom. Eq. Jur. § 626 ; 59 Am. Dec. 378 ; 64 Ib. 201 ; 38 Ib. 124 ; 14 Ib. 135.

She cannot, therefore, claim to be a *bona fide* purchaser. Besides, in her answer, Mrs. Meirs admits that her whole information was derived from the deeds, and the fact that the complainants at the time of her purchase were tenants of her vendors and became her tenants without objection. She does not deny notice positively, fully and precisely. Story, Eq. Pleading, § 810.

The court should have permitted complainants to show the invalidity of Halpin & Co.'s debt resulting from their failure to pay the privilege tax required by law. This point involving public revenue should have been favorably considered, especially since the whole record shows a scheme to defraud a lot of ignorant, confiding negroes.

The wives of the appellants had no relation or participation whatever in the transaction with Halpin, Bonham & Co., and they are entitled in this bill to obtain protection of their homestead rights as against the debts due to said firm. Mrs. Meirs acquired the right and interest of Halpin, Bonham & Co. No more, no less. They could not subject the homestead of the appellants to the debts apart from the trust-deed, and could not under the trust-deed, because the wives did not join. Appellants were tenants in common and entitled to homestead exemptions. *McGrath* v. *Sinclar*, 55 Miss. 59 ; 27 Ark. 648 ; 36 Vt. 254 ; 38 Mich. 389 ; 59 Ala. 345.

*S. M. Shelton,* for appellees.

The deed of trust did not require a sale of the personal property before the realty, nor did it require sale of all the property, but

only so much as might be needed to pay the debt and costs of foreclosure. It was not incumbent upon the trustee to take possession of and sell the personal property, and the proof shows that such personal property was incumbered by a second deed of trust in favor of Halpin & Co. to secure a debt for $8000 maturing at the close of the year 1882. To have sold the personalty first would have been to destroy his security for the second debt. Taking possession of the property was not a condition precedent to. the power of sale. The trustee was not required to take possession except upon the request of the holder of the note. The bill should have averred this request in order to have put the trustee in default. The denials in the answer of fraud in the conduct of Halpin & Co., and fraudulent concealment in the sale of the land are sufficient. It is not necessary that there should be a denial of the facts unless they are within the personal knowledge of the respondent, but of all knowledge, information and belief. *Mead* v. *Day*, 54 Miss. 63 ; *McAllister* v. *Clopton*, 51 Ib. 259 ; Story, Eq. Pleading, § 854 ; *Carpenter* v. *Edwards*, 64 Miss. 596.

The trustee's deed recites that he advertised and sold the land in accordance with the provisions of the trust-deed. The law presumes that all things to be done *in pais* in execution of the trust were done as required by the deed. *Graham* v. *Fitts*, 53 Miss. 307.

Mrs. Meirs was a *bona fide* purchaser and not chargeable with the fraud of Halpin & Co., if any existed. She was not required to prove her good faith until the fraud of her vendors was established. *Fulton* v. *Woodman*, 54 Miss. 158. The evidence wholly fails to establish any fraud.

Appellants are not entitled to any homestead in the lands as against the debts due to Halpin & Co. While it is true that a homestead may be acquired in common property by tenants in common, the rule has no application in this case. There never was any partition of the land. On the contrary, the appellants expressly declared that there had been no such partition, and that the interest of the parties had never been ascertained and could not be settled until the land had been paid for. The interest of each was to be in

proportion to the amount paid by him.  The idea of homestead exemptions never entered into the minds of any of the parties until the bringing of this suit.  The appellants called this a colony, and elected Peter Hamilton its president.  They held meetings and acted together through their president.  The debts were for their joint benefit, most of it to pay for the purchase-money notes for the land.  In any event, Halpin & Co. in equity succeeded to the lien existing on the lands for the purchase-money.

It was right for the court to refuse to allow the bill to be amended, in order that complainants might show that Halpin & Co. had not paid their privilege tax when the trust-deed was executed.  It was then too late.  The cause was on final hearing.  Besides, such failure, if true, could not affect the purchaser, Mrs. Meirs.

Argued orally by *W. L. Nugent,* for appellants, and *S. M. Shelton,* for appellees.

WOODS, C. J., delivered the opinion of the court.

1. The position of appellants' counsel to the effect that the taking possession of the property by the trustee was a condition precedent, is, we think, indefensible.  The trust-deed declares that " it shall be the duty of the party of the third part herein, at the request of the holder of said note, to take into his possession all the property described herein," etc.  Clearly the case falls within the rule prescribed in *Tyler* v. *Herring,* 67 Miss. 169, and in *Vaughn* v. *Powell,* 65 Ib. 401.  The trustee, by the provision quoted, had the right to take possession of the property, at the request of the beneficiaries, but the taking possession was not a condition precedent to the power to sell.

2. The contention that the bill charges that no sale was ever made by the trustee, and that the answer does not deny this, has been attentively examined and considered.  The charge of the bill substantially is, that two of the complainants were at the court-house in Vicksburg, and on the day of sale, and that they neither heard nor saw any sale ; that on information they have doubt if any sale actually took place, and they aver there was no public ven-

due.  The charge is part of the sweeping complaint of Halpin &
Co.'s fraudulent conduct throughout, and particularly of their
fraudulent behavior in concealing and in making the sale by the
trustee.  In her answer Mrs. Meirs says: "She also expressly
*denies all knowledge, belief* or *suspicion of fraud* [the fraud alleged
to have been perpetrated by Halpin & Co.] practised upon com-
plainants by any one else in connection with the lands. . . . . Re-
spondent says that as to the several charges in said bill relating to
fraud, covin and misrepresentation practised upon complainants in
obtaining their signatures to said deed of trust; in concealing from
them the time of said sale; in misapplying proceeds of cotton; in
extortionate prices charged and in usurious interest and unlawful
commissions; *and in the sale of said land,* if any such fraud there
was, she is wholly without knowledge, information or belief, and
insists that in the controversy between her and complainants such
charges are wholly immaterial; but, if held to be material, she
insists that strict proof thereof shall be made."  It occurs to us
that there was such denial of the charge of fraud in the concealment
or omission of the sale by the trustee as to prevent our considering
this charge of fraud as confessed by her.  We think her denial suf-
ficient, and that it put complainants on making proof of the charge.
And we can finally dispose of this branch of the case by adding
that no proof on this point was made or attempted to be made,
though both the complainants who were said to have been at the
court-house all day, on the day of the trustee's sale, were fully ex-
amined, and though the complainant who made affidavit to the bill
was also thoroughly examined in his own behalf.

3. There is no reversible error in the refusal of the chancery
court to allow proof of the failure of Halpin & Co. to pay the
proper privilege tax.  It was said by this court in a similar case,
*Deans* v. *Robertson,* 64 Miss. 195, "who seeks equity must do
equity; a bill to cancel a contract on the ground of illegality will
not be maintained unless it offers to pay what is justly due," and
this rule is well settled and was of force in the action of the court
complained of.

4. From the position on which we rest our opinion of the mate-

rial and controlling question involved, it will appear that only that question now remains to be considered.

It is argued by counsel with great learning and ability that complainants were tenants in common of the lands, were using and occupying homesteads therein to an extent covering the entire plantation, and that the wives not having joined in the conveyance, their homestead rights are not affected by the transfers from the trustee to Halpin & Co., and from the latter to Mrs. Meirs. It is altogether correct, as a legal proposition, that tenants in common may have and enjoy homestead exemptions in the common estate; but, in our view of the case, this proposition becomes immaterial.

There is proof that all the complainants joined together in the venture, which resulted in the conveyance to them by Irby and wife of the lands in controversy; and there is proof that the persons engaged in the venture were known as the Bear Camp Colony —a community of persons voluntarily united as a single entity. There is striking proof that this was recognized and authorized by complainants themselves in the face of exhibits 2 and 3 to the original bill, in which the balances due the complainants, named in those exhibits, after settlement of their individual accounts, were transferred to the credit of the Bear Camp community account, and these exhibits, furnishing this proof, were produced by complainants. Exhibit 11 to Jno. F. Halpin's deposition affords striking proof touching the character of the venture of complainants. It is a formal trust-deed executed, in terms, by the "Bear Camp Colony" to Halpin & Co., and was acknowledged before a proper officer by "Peter Hamilton, President of the Bear Camp Colony." There is yet more significant proof of the character which complainants assumed and which they really possessed, in their own agreement in writing, duly acknowledged before an officer, and made exhibit 10 to Jno. F. Halpin's deposition. This instrument, after reciting the purchase of the lands by complainants from Irby and wife, and the execution of their several promissory notes for the purchase-money, says: "That when said notes shall all have been paid off and satisfied according to their meaning and tenor, then the interests, shares and claims in and to said land of said

respective parties shall stand, and be in proportion to the several amounts paid respectively by said parties in settling said notes; that is to say, that each man's share in said land shall bear the same proportion in quantity and value to the whole land, as it then exists, as the sum or sums of money paid by him in settlement of said notes bears to the whole sum paid by all the parties in payment of said notes, and if any of said parties should pay nothing on said notes, or should have paid nothing heretofore, he shall have no share in said lands. This agreement being to reduce to writing the verbal understanding and agreement of said parties when said lands were conveyed to them as aforesaid."

From this instrument made by complainants, solemnly and formally, it appears with all reasonable certainty that these parties, complainants, neither thought themselves to be, nor, in fact, were tenants in common. The language of the instrument palpably excludes any such idea. From the instrument it seems that at the time of its execution, and at the time of the purchase from Irby and wife, complainants, as a whole, were engaged in a venture that it was expected and hoped would result in securing the plantation to the complainants, or to some of them. What interest, if any, any one or all of the purchasers had, or might finally have, was conjectural only. If any member of the community proved industrious and economical and met with success in his labors, he would have proportionately in the ultimate settlement of the rights of ownership of complainants; if any member of the *camp* proved idle, thriftless and improvident, he might, at least, be entitled to absolutely nothing in the outcome of the venture. Each of the complainants was to put in time and toil and money, and his share in the land was to be proportionate to and determined by the labor and capital he put in. If he put into the common stock much, he was to receive much; if he put in little, he was to receive little; if he put in nothing, he was to receive nothing. Has a holding, thus marked and characterized, a single distinctive feature of a tenancy in common? We are bound to answer, no.

What, then, was the Bear Camp Colony? And what was the nature of the property held by them in the plantation? They

were a partnership in that particular enterprise—partners engaged in one common venture—and the plantation was an asset of such partnership, and liable for its debts, just as any other asset of a partnership. Until the debts of the partnership had been paid, the real estate of the partnership is to be treated as personalty, as between the partners and their creditors. Of course, after the dissolution of the partnership, as between the partners, the realty is held by the partners as tenants in common. This view of the case renders unnecessary any opinion on the questions presented touching the rights of any or all of the complainants as homestead exemptionists, as set up and asserted in their bill.

It is to be regretted that the written and documentary evidence in the record uniformly contradicts the statement of the complainants when room for such contradiction exists. The instances are numerous, and we would fain charge these painful lapses from absolute verity on the part of complainants, to their ignorance of some things which they plainly did and which they deny, and to their forgetfulness of others. But the palpable and violent contradictions are painfully present, and the complainants' cause is no way assisted thereby.

On the facts, we see no cause to disturb the decree of the chancellor, and it is

*Affirmed.*